Ms. Cherniavsky is with us today. I'd like to start out by apologizing. I'm recovering from both bronchitis and laryngitis. I'm sure if the court is having difficulty understanding me that you'll ask me to repeat myself. I'd like to first start out by addressing Mrs. Cherniavsky's conviction and the insufficiency of the evidence on that conviction. What's my standard of review on this? The standard of review, let's see, is... Don't I have to consider the evidence in the light most favorable to the prosecution? Certainly. And then it is that any rational trier of fact couldn't have found the essential elements of the crime beyond a reasonable doubt. Certainly. So there's no question that your client owned and operated JC, right? Actually, there is some question. That's the way you phrase it, Your Honor. There actually is. Well, I'll be fair. Reading the record, it seemed that your client owned and operated JC, was educated on the Medicare rules and regulations, managed the office and paperwork, which contained extensive missing paperwork and documents, handled the Medicare inspections, and responded to the audit requests. It seems to me that we take those five, I'm having a tough time, why there's not sufficient evidence. And thank you, Your Honor, because I will address those, because I do think that the evidence does not support the conclusions that Your Honor just listed. Well, I tried to look at the evidence, and that's why I laid it out for you, so give me a good reason. Okay. Let me let you know, understand. To put it very bluntly, and what was found throughout the evidence, and I'll just put it very bluntly, Mr. and Mrs. Chernovsky are Russian, Russian born. They had a traditional marriage. Mrs. Chernovsky raised the children.  The evidence was undisputed that Mr. Chernovsky thought up the business, managed the business. He did everything with the business. Mrs. Chernovsky merely helped out, all right? But she was the one who was physically present in the putative store most of the time. Part of the time. Part of the time. What had happened was, you know, that Mr. Chernovsky opened this business. He had an employee in the beginning. The employee wasn't working out. So he asked Mrs. Chernovsky, you know, because the store has to be open a certain number of hours, would she be in the store during part of the day until he could get there later? I mean, you start out with this problem, which is that she was the recorded owner. I assume, I don't know what you mean by she wasn't the owner. Oh, no, she was on paper the owner. There's no question about that. Well, I guess really you may be making a good jury argument to say to the jury, now look at this evidence and look at it this way instead of look at it this way. But my whole deal, and that's why I started out with the standard of review, is that I have to look at the evidence in the light most favorable to the prosecution. And I understand that. And I don't think you've done that yet. You're making your best argument to the jury, but making it in the light most favorable to the prosecution, I think you've missed the point. Then let me address it. There was absolutely no evidence that Mrs. Chernovsky had. Well, let me even go back and distinguish some things. Okay? Simply because Mrs. Chernovsky had some involvement with the business doesn't mean that she had any awareness of any fraud. Okay? So basically, Your Honor, from what I understand... Well, if she was looking at the... I mean, the problem is you do need a series of inferences. But the inference would have to be that if she was keeping the files and if she was at least signing a lot of the checks so she saw them and signing some of the other documents, she should have noticed, would have noticed, that almost all or most of the... First of all, that most of the business was for these power wheel shares and that most of them were from the same doctors and that many of those were from doctors that were affiliated with her husband. And that... As to the missing documents, I didn't think there was evidence of massive missing documents. No, no, there wasn't. I thought there was evidence of a couple missing documents. No, no, there wasn't. All right. And let me address each one of those. I want to take the signing of the bank account and other documents. The thing that this Court has to look at, the government never, ever put on an expert to talk about signatures. Never once. If this case was about Mrs. Cherniofsky signing signatures, then the government should have gotten an expert witness to put on and say this is her signature. It was purportedly her signature. I'm sorry? It said it was her signature, right? Who? The signature was Amalia Cherniofsky. Yeah. She signed the checks to actually... And whether it was her or not, it was her name. That's all I'm saying. Right. And that's something different. But ordinarily one would think if it was her name she signed it, so if you were going to dispute whether she signed it, that would have been for you. You put no... I mean, the thing that really sort of... Did you put on witnesses in this case? I do not believe so. Right. So, I mean, that's kind of the whole here. I mean, you didn't have an explanation for any of this either. Your Honor, I'm sorry. If I can please just answer. Yes, okay. Because they didn't need to put on witnesses, because the co-conspirators themselves testified as to Mrs. Cherniofsky's non-involvement. One of the co-conspirators specifically testified that Mr. Cherniofsky signed Mrs. Cherniofsky's name to things, and he could recognize that, and he even testified as to on the most salient documents it was Mr. Cherniofsky who had signed Mrs. Cherniofsky's name, all right? Did he testify to that as to the George Liang checks? Yes, that is exactly what he testified to. And the jury did not believe the testimony? I do not. I don't think that... Presumably. Couldn't get to where they did if they believed it. No, I'm not sure. I think that that's going a little too far, because... And also, I will say the jury did... I will say, no, the record shows that the jury did not believe it. That jury note is incredibly important. And let me just read to the court the note that the jury sent out. It said, does an owner of a DME business billing Medicare have a responsibility to detect specific cases of fraud? If the owner was not aware of any activity but should have been, are they responsible? Right there, that tells you right there that the jury did not believe that was one juror's note, and how was it resolved by the judge? The judge actually... Well, and that's the second argument that we want to get to, is that the judge failed to give an appropriate jury instruction. That's on a different subject. That is on a different subject. I mean, the instruction was on a different subject. Yeah, yeah. Now if we're just talking about insufficiency of the evidence, and this is a little bit later, but at the sentencing hearing, it was the judge himself who said that Mrs. Chernyofsky pointed out that she had a traditional marriage and she wasn't doing anything more than what her husband told her to do. So the judge wasn't convinced either. That's a mitigation argument at sentencing that she was not a leader or an organizer, that she, that someone else was more of a prime mover. Correct? Isn't that all that is? No. A comment from the judge? I'm sorry, Your Honor, but no, I do not believe that. But whether she, I mean, one does get the sense that that was happening, but if what her husband told her to do was to, you know, sign somebody else's name to something, for example, or, you know, tell the government that I don't have any connection to a medical business even though I do, it doesn't matter whether she did it because he told her to, right? And, Your Honor, this, thank you, those are perfect examples. To speculate about conversations that never took, that there is no evidence took place is just that, is pure speculation. Well, wasn't there testimony that she was asked by the agent or the investigating Medicare person, does a family member or someone related to you own a medical business? And she responded no. Yes. And that was a lie. No, no, not necessarily. Well, wasn't he involved with another business, L.A. Stat? L.A. Stat. And this is the thing. One, L.A. Stat became defunct in 2010. But at least what, there was a strange sentence in, about the timing of that and maybe it was a closing argument because you said, in fact, it became defunct in December of 2010. In 2010. And this statement was made in March of 2010. So. So, therefore, it wasn't true when it was made. But the thing is, there was no showing that he was actually running the business. There was L.A. Stat. There was no showing that Mrs. Chernyavsky knew that he had this business entity. Well, she also knew that he was over at this other medical place all the time. And that is of no relevance because the fact that he is working at another establishment is not the same as the question that was asked and the requirements there. Because he didn't own it? I'm sorry? Because he didn't own the other one? No, he didn't own the other one. So, again, you're making so many leaps. One, you're making the leap that Mrs. Chernyavsky knew that he had established this legal business, which there is no evidence to show that. Two, you need to prove that that business was functioning even though there's some indication that it probably wasn't because he disbanded it in 2010. So, again, those are all speculative leaps. Well, you can call it a speculative leap, or you can call it a series of inferences that add up to something. Well, there is a difference between an inference and speculation. The law shows that those are two different things. And it is speculative when you simply make something up out of whole cloth. You know, you can't just pretend that she was aware of all this, particularly, in fact, of the evidence that was there. We keep talking about inferences instead of looking at the testimony that was given. The Koch conspirators testified six ways from Sunday how Mrs. Chernyavsky was not involved. She didn't come into the office. She didn't talk about anything. She didn't deliver any of the supposed kickbacks. She did absolutely none of those things. You look at the testimony of Alisa Haromelek. She was the biller for the company for seven years. She said Mrs. Chernyavsky had almost no involvement. She thought that the only thing Mrs. Chernyavsky did in the seven years she worked there was simply answer the phones, all right? And that's, again, because there was so much testimony showing that she was not involved. Okay. Your time is up. We'll give you a minute to rebuttal. Thanks so much. Thank you. May it please the Court, Elizabeth Dinello for the United States. Good morning. Viewing the evidence in the light most favorable to the government, there was ample evidence from which a reasonable juror could find beyond a reasonable doubt. Could you just give us, like, the five? Actually, let me narrow it down to three, Your Honor. Let me begin by saying that I think it's at least weak. So go ahead. I can narrow it down to three. And let me just note that in our brief, pages 21 to 29, we review in detail the evidence supporting her convictions. But I can emphasize, and I'd like to, just three points here. First, she lied about the company. She was well-versed in Medicare rules and regulations. What about the company did she lie? About the ownership of JC Medical. She repeatedly told Medicare and Medicare investigators that she and she alone owned the company. And also that she was the only one with managing authority. That's in the Medicare application itself. Yet, as we know, it was her husband who was intimately involved and who claimed also an ownership interest. Well, on the ownership interest, I mean, there's community property in California. So it doesn't, I mean, if she says, it's always true that if I'm the owner of a business, my husband is half the owner. So that's not helpful. But Medicare makes clear that identifying the actual owner of a company, we're not talking about a property, a state property interest. We're talking about a business interest for purposes of Medicare. And it's important for self-dealing regulations that Medicare be aware of who owns a particular company. And I'd note, too, that there was no confusion back in 2009, well before the dissolution of Mr. Chernofsky's company, when she's visited by Investigator Bell. And this is in the transcript or the excerpts of record, page 1583-84, when he's asked who represented themselves as the owner of J.C. Medical, Amalya Chernofsky. Did Ms. Chernofsky ever indicate that he had an ownership interest in medical supply? No. Did you ask Ms. Chernofsky whether or not any relatives of hers own any other medical entities? Yes. And what did she tell you? No. Those are clear questions, clear answers. She knew what she was doing. And the fact that she may have been, as she claims, in a traditional marriage, which, by the way, there was no evidence at trial with respect to their marriage, their relationship, all that's revealed is that they have children and that occasionally she leaves to pick up the children. We have no evidence presented to the jury with respect to the traditional nature of their marriage. But when she agrees to set up the company in her name and pretend that it's hers, of course she knew that fraud was afoot because why else would she agree to do that? Second, she wrote the kickback checks to or she signed the kickback checks to George and Harriet Lange. There is no evidence in the record at trial that her husband signed those checks. Well, I didn't see it. Just a minute. That there was testimony by George Lange that she didn't sign it. With all due respect, Your Honor, that is incorrect. I'm not saying it's correct. I'm saying I was just told that. No, her assertion is incorrect. In fact, the testimony, which is at pages 1868 and 1869 of the excerpts of record, Mr. Lange says that Vladislav filled out the checks. There is no testimony that she signed the checks. And, in fact, Lange assumed that she signed the checks. And, indeed, he testified that with respect to one check, the ink on the body of the check and the ink on the signature are different, which supports the conclusion that if her husband filled out the check, she indeed signed it. In any event. Well, but that, I mean, if she only, if he just gives her a bunch of checks and says sign them, it doesn't prove anything about what she knew to whom this check was going and why. Well, she knew that neither George nor Harriet Lange were employees of J.C. Medical Supply because she worked there. She knew that they weren't providing services because, again, she does, she mans the office. So she had to have understood that those checks were illegal kickbacks. And that inference is further supported by the fact that she withdrew large amounts of cash from the checking account. Our brief notes that it's up to $62,000, and these are in not small increments, but they're $10,000, $2,000, $2,500. This is not just cash to pay the Saturday night babysitter. The jury could use that evidence in addition to her signature on the checks to infer that she understood she was paying kickbacks. But going back to the signature also, the jury could compare her signatures on these checks to the known signatures that the government introduced into evidence. This is not a situation of an extreme or unusual circumstance where the jury should not be allowed to make its own comparison. The authenticity of her signature on these checks was not the primary issue at trial. In fact, it was barely even an issue at trial. In closing argument, for example, and this is at page 1399, defense counsel spends three lines out of a closing argument that's over 330 lines. And we know that Vlad had written her name and used her name at least on 1099. That was a tax form that was provided for Harriet Lange. It's reasonable to believe he wrote her name or signed her name on other documents. That's it. This is not a situation, therefore, the jury could not have assessed the signatures and seen that they were similar. And then finally, third point that supports and indeed we believe establishes this to be a case of overwhelming evidence of guilt is the files itself, which she admitted that she maintained. She says that to Special Agent Coleman. Your Honor had suggested that there were just a few isolated incidents. There was no testimony about how widespread the fraud was in the files. In fact, Agent Coleman says that there were many, many instances of no home assessment, page 2110. Many, many instances of a claim being submitted before documentation. I was going by the times that the other person went in and had 5,000. But this is after the fact when they got hold of the files? This was when the search warrant was executed in 2013, which was the ending point of the conspiracy. And the investigators went through these files and found them to be rife with instances of fraud. And moreover, this fraud was obvious. Well, the fraud being the absence of? Well, take for example the testimony about the file for Edward Lee, who was the subject of count two. And this testimony is at pages 2163 to 71. In this one file there was evidence that the ink on the prescriptions was different, that there were different doctors, that there was no date on the evaluation, that the medical term hypertension, common term, which she is charged with knowing, was misspelled and misspelled in several different ways. And moreover, Edward Lee was prescribed a power wheelchair, even though the file indicated that he ambulates well. Anybody looking at that file would understand. Well, but we don't know that she looked at the file. I mean, that's what's wrong with this. But she? We know that she took some papers and put them in the file. But where she is the only one who is filing this stuff, and she is the one to whom Medicare is corresponding, the audit request for Sartheev that was addressed to her. File clerks don't usually read what they write, what the documents say. But she is running the office. Did Vadoslav work in the office? Only filling in for her. He spent most of his time at suite two. The evidence was that he occasionally would relieve her if she had to leave early to pick up the children. George Lang testifies to that. But otherwise the testimony is that she is the one who is there. And, indeed, when investigators go visit her, she is the one who is manning the office. She is the one who is knowledgeable about the files, who is able to pull the documents, who understands that documents are supposed to be there. And from that evidence, the jury could infer that she knew that fraud was afoot. Does the Court have any further questions? Tell me a little bit about the error in calculating the restitution. An error that, to start, Your Honor, we submit was invited, that when she asked the Court to impose restitution of a specific amount, she knowingly relinquished the right to challenge that amount later on. The focus of her sentencing memorandum was on the correct amount of intended and actual loss. She understood that those amounts could be calculated in different ways. When she told the judge that it should be a specific amount, and she was very specific in the amount, $615,418, the judge could hardly be faulted for giving her what she suggested. In any event, there was no error. So you're suggesting, then, that she waived her claim? Waived her claim. But even if she didn't, Your Honor, there was no error, plain, clear, or otherwise, as the panel in Mr. Chernofsky's case found. It's my understanding that the amount that was imposed was that amount which Medicare had paid for the power wheelchairs and the power wheelchairs' accessories? Correct. Not all of it, either. It was the full amount that Medicare paid, as Judge Smith says, for the wheelchairs and the accessories, not the full amount that J.C. Medical billed, because about 25% were for non-power wheelchair-related items. I thought it was $1.1 million for the chairs. $1.1 million, that was what was billed, and the $615,000 was what was paid. I ask the Court to affirm the judgment of the District Court.  Okay, thank you very much. Thank you, Your Honor. I do want to correct the discussion on the check. Amalia Chernofsky, she did sign the check. She did not fill the check out. It was the testimony from the co-conspirator, the kickback check, that it was actually Mr. Chernofsky who had done that. And what about the suggestion that there was no legitimate basis for this check, so she must have known it was a payback? No. How would she have known? And, again, and that's just really the one or two checks there. There aren't many checks on kickbacks at all that they are claiming are kickbacks. So that's not, there was a $1099, which, again, they didn't really show that she had signed that, and she never delivered them. There was simply no other evidence on that. Again, I want to just go through the points. She did tell an investigator that it was her husband who managed the store. Also, in terms of Mrs. Chernofsky being the person who ran the store, I would strongly disagree with that. The testimony from, again, the medical biller, was that she really only dealt with the husband. She never asked the wife questions because she thought Mrs. Chernofsky only answered the telephone. There was information from a vendor that said, no, I only deal with the husband. All of the witnesses who received chairs testified that they had, that it was only Mr. Chernofsky who came out and delivered the chairs. There was testimony after testimony that it was Mr. Chernofsky. And that is what even the court found, you know, later on at sentencing. So I wanted to go over that. And the withdrawal of cash, or the withdrawal of monies from the checking account and banking account, this was their business. Again, I think we keep clouding the fact that Mrs. Chernofsky... The point seems to be that it was cash. Well, and... Large amounts. And so Mrs. Chernofsky had to know something because she was withdrawing cash. I mean, there was no correlation as to what that cash was being used for. There was nothing about how much was being used for any kickbacks, if that was the case. It could be a family that used cash. I mean, there was nothing, there's nothing more there to really tie that into any kind of wrongdoing. Or Mrs. Chernofsky knowing that there was any wrongdoing. And so I would like to just very quickly touch on the restitution because that is very important to Mrs. Chernofsky. You're out of time. I'm out of time. Please. All righty. Thank you so much. Thank you very much. United States vs. Chernofsky is...
judges: Berzon, N.R. Smith, Castel